**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YING ZHAO, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> FXCM INC., DROR NIV, and ROBERT N. LANDE, <br><br> Defendants. | **Case No.** <br><br> **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiff Ying Zhao ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding FXCM Inc. ("FXCM" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired FXCM securities between March 15, 2012 and February 6, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      FXCM is an agency that provides online foreign exchange (FX) trading and related services to retail and institutional customers.  The Company acts as a credit intermediary, simultaneously entering into trades with the customer and the FX market maker, which allows customers to trade currency pairs on the over-the-counter foreign exchange markets.  FXCM's sole asset is an equity interest in FXCM Holdings, LLC.  Forex Capital Markets LLC is the U.S. subsidiary of FXCM Holdings, LLC.

3.      The Company was founded in 2010 and is headquartered in New York, New York. FXCM's stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "FXCM."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) between September 4, 2009 through at least 2014, FXCM's U.S. subsidiary engaged in false and misleading solicitations of its foreign exchange customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk" platform had no inherent conflicts of interest with the Company's customers; (ii) FXCM's U.S. subsidiary made false statements to the National Futures Association regarding the Company's relationship with

the market maker; (iii) accordingly, FXCM had misled investors with respect to the Company's adverse position to its retail customers; and (iv) as a result of the foregoing, FXCM's public statements were materially false and misleading at all relevant times.

5.     On February 6, 2017, the U.S. Commodity Futures Trading Commission ("CFTC") issued an order, fining FXCM and its founding partners, Dror Niv and William Ahdout $7 million for defrauding retail forex customers.  The CFTC order stated in relevant part:

> Washington, DC – The U.S. Commodity Futures Trading Commission (CFTC) today issued an Order filing and settling charges against Forex Capital Markets, LLC (FXCM), its parent company, FXCM Holdings, LLC (FXCM Holdings), and two founding partners, Dror Niv, and William Ahdout, who were, respectively, Chief Executive Officer of FXCM and Managing Director of FXCM, (collectively, Respondents). FXCM's principal place of business is New York, New York; Niv resides in Connecticut; and Ahdout resides in New York.
>
> ***The CFTC Order finds that, between September 4, 2009 though at least 2014 (the Relevant Period), FXCM engaged in false and misleading solicitations of FXCM's retail foreign exchange (forex) customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk" platform had no conflicts of interest with its customers. The Order finds FXCM, FXCM Holdings, and Niv responsible for FXCM making false statements to the National Futures Association (NFA) about its relationship with the market maker.***
>
> ***The Order requires Respondents jointly and severally to pay a $7 million civil monetary penalty and to cease and desist from further violations of the Commodity Exchange Act and CFTC Regulations, as charged.*** FXCM, Niv, and Ahdout agree to withdraw from CFTC registration; never to seek to register with the CFTC; and never to act in any capacity requiring registration or exemption from registration, or act as a principal, agent, officer, or employee of any person that is registered, required to be registered, or exempted from registration with the CFTC.
>
> **"The CFTC Is Committed to Protecting Customers from Harm in the Markets It Regulates"**
>
> "Full and truthful disclosure to customers and honest discourse with self-regulatory organizations such as NFA are vital to the integrity and oversight of our markets," said Gretchen L. Lowe, Principal Deputy Director and Chief Counsel of the CFTC's Division of Enforcement. "Today's action's demonstrates that the CFTC is committed to protecting customers from harm in the markets it regulates."

FXCM is registered with the CFTC as a Futures Commission Merchant and Retail Foreign Exchange Dealer. FXCM has been providing retail customers with access to over-the-counter forex markets through a proprietary technology platform and has acted as counterparty in transactions with its retail customers in which customers can buy one currency and simultaneously sell another. Both Niv and Ahdout were CFTC registrants during the relevant period.

***FXCM, under Niv's and Ahdout's direction and control, misrepresented to its retail forex customers that when they traded forex on FXCM's No Dealing Desk platform, FXCM would have no conflict of interest, the Order finds.*** In addition, according to FXCM's marketing campaign, retail customers' profits or losses would have no impact on FXCM's bottom line, because FXCM's role in the customers' trades was merely that of a credit intermediary, the Order finds. ***FXCM further represented that the risk would be borne by banks and other independent "market makers" that provided liquidity to the platform, according to the Order.***

**FXCM's Undisclosed Interest**

***Contrary to these representations, the Order finds, FXCM had an undisclosed interest in the market maker that consistently "won" the largest share of FXCM's trading volume – and thus was taking positions opposite FXCM's retail customers.*** FXCM, the Order finds, formulated a plan in 2009 to create an algorithmic trading system, using an FXCM computer program that could make markets to FXCM's customers, and thereby either replace or compete with the independent market makers on FXCM's "No Dealing Desk" platform. Although FXCM eventually spun off the algorithmic trading system as a new company, in actuality the company remained closely aligned with FXCM, according to the Order. This market maker received special trading privileges, benefitted from a no-interest loan provided by FXCM, worked out of FXCM's offices, and used FXCM employees to conduct its business, the Order further finds.

The Order finds that FXCM and the market maker agreed that the market maker would rebate to FXCM approximately 70 percent of its revenue from trading on FXCM's retail forex platform. In total, through monthly payments from 2010 through 2014, the company rebated to FXCM approximately $77 million of the revenue it achieved. However, FXCM did not disclose to customers, among other things, that this company – FXCM's principal market maker – was a startup firm spun off from FXCM, the Order further finds.

**False Statements to the NFA**

***The Order also finds that FXCM willfully made false statements to NFA in order to conceal FXCM's role in the creation of its principal market maker as well as the fact that the market maker's owner had been an FXCM employee and managing director.*** The Order finds that during a meeting between NFA compliance staff and FXCM executives, Niv omitted to mention to NFA the details of FXCM's relationship with the market maker.

*The Order holds Niv and Ahdout liable for FXCM's fraud violations as "controlling persons" who were responsible, directly or indirectly, for FXCM's violations. Niv is also held liable for FXCM's false statements to NFA as a controlling person who was responsible directly or indirectly for those violations.* FXCM Holdings is held liable for FXCM's fraud and false statement violations as principal of FXCM, the Order also finds.

The CFTC thanks NFA for its assistance in this matter.

(Emphases added.)

6.      On that same day, FXCM issued a press release, filed on Form 8-K with the SEC

on February 7, 2017, entitled "FXCM US Reaches Settlement with NFA and CFTC," announcing

the Company's withdrawal from U.S. markets.  In the press release, FXCM stated in relevant part:

NEW YORK, February 6, 2017-- FXCM Inc. (NASDAQ:FXCM) ("FXCM") today announced simultaneous regulatory settlements with the National Futures Association ("NFA") and the Commodity Futures Trading Commission ("CFTC") against its U.S. subsidiary, Forex Capital Markets LLC and certain of its principals. FXCM Holdings, LLC was also named in the CFTC settlement. The named FXCM entities and principals neither admit nor deny the allegations associated with the settlements. *The NFA settlement has no monetary fine, and the CFTC settlement has a $7 million fine.*

*FXCM will be withdrawing from business in the U.S. and has signed a non-binding letter of intent with GAIN Capital Holdings, Inc. ("GAIN") under which GAIN would purchase FXCM's U.S. customer accounts.* The transaction is subject to regulatory approval and a definitive agreement.  FXCM and GAIN are working to determine the timing for the account transfer and expect to provide further information in that regard in the coming days.  In 2016, FXCM's U.S. business had unaudited net revenues of approximately $48 million and generated an EBITDA[1] loss, but the costs associated with the business will not be transferring to GAIN.  There will be no changes to FXCM customers outside of the United States.

Withdrawing from this business will free approximately $52 million in capital.  Proceeds from the account sale and the release of capital will go toward the further repaying of FXCM's loan from Leucadia National Corporation.

FXCM will for the interim period continue to service its U.S. customers and to provide top quality trade execution pending the customer-account sale and business withdrawal.  FXCM will also be working diligently to be sure that an account transition to GAIN's retail brand, FOREX.com, will be orderly, expeditious and seamless.  FXCM wants to express its most sincere thanks to those U.S. customers

who have been with FXCM over the years and wish you all the best of luck following this transition.

FXCM wants to stress that these settlements have no impact on any customer of FXCM's global businesses. FXCM and its global subsidiaries will continue to provide excellent execution and competitive pricing to its customers overseas through its award-winning technology, customer service and trading tools.

(Emphasis added.)

7.     On this news, FXCM's share price fell $3.40, or 49.64%, to close at $3.45 on February 7, 2017.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

13.    Plaintiff, as set forth in the attached Certification, acquired FXCM securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.    Defendant FXCM is incorporated in Delaware. The Company's principal executive offices are located at 55 Water Street, 50th Floor, New York, New York 10041.  FXCM's shares trade on the NASDAQ under the ticker symbol "FXCM."

15.    Defendant Dror Niv ("Niv") has served at all relevant times as the Company's Chief Executive Officer and Chairman.

16.    Defendant Robert N. Lande, CFA ("Lande") has served at all relevant times as the Company's Chief Financial Officer.

17.    The Defendants referenced above in ¶¶ 15-16 are sometimes referred to herein as the "Individual Defendants."

**SUBSTANTIVE ALLEGATIONS**

**Background**

18.    FXCM Inc. is an agency that provides online foreign exchange (FX) trading and related services to retail and institutional customers.  The Company acts as a credit intermediary, simultaneously entering into trades with the customer and the FX market maker, which allows customers to trade currency pairs on the over-the-counter foreign exchange markets.  FXCM Inc.'s sole asset is an equity interest in FXCM Holdings, LLC.  Forex Capital Markets LLC is the U.S. subsidiary of FXCM Holdings, LLC.

**Materially False and Misleading Statements Issued During the Class Period**

19.    The Class Period begins on March 15, 2012, when FXCM filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter

and fiscal year ended December 31, 2011 (the "2011 10-K").  For the quarter, FXCM reported net income of $3.23 million, or $2.10 per diluted share, on revenue of $108.69 million, compared to net income of $150,000, or $0.10 per diluted share, on revenue of $96.09 million for the same period in the prior year.  For fiscal year 2011, FXCM reported net income of $12.74 million or $7.70 per diluted share, on revenue of $415.58 million, compared to net income of $150,000, or $0.10 per diluted share, on revenue of $360.16 million for fiscal year 2010.

20.     In the 2011 10-K, FXCM stated in relevant part:

> ***Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers***, reduces our risks and provides distinct advantages over the principal model used by the majority of retail FX brokers. In the principal model, the retail FX broker sets the price it presents to the customer and may maintain its trading position if it believes the price may move in its favor and against the customer. We believe this creates an inherent conflict between the interests of the customer and those of the principal model broker. Principal model brokers' revenues typically consist primarily of trading gains or losses and are more affected by market volatility than those of brokers utilizing the agency model.

(Emphasis added.)

21.     The 2011 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Individual Defendants, stating that the financial information contained in the 2011 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

22.     On May 10, 2012, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2012 (the "Q1 2012 10-Q").  For the quarter, FXCM reported net income of $2.89 million, or $1.60 per diluted share, on revenue of $102.32 million, compared to net income of $2.80 million, or $1.60 per diluted share, on revenue of $94.58 million for the same period in the prior year.

23.     The Q1 2012 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

24.     On August 9, 2012, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2012 (the "Q2 2012 10-Q").  For the quarter, FXCM reported a net loss of $1.44 million, or $0.60 per diluted share, on revenue of $91.41 million, compared to net income of $3.32 million, or $1.90 per diluted share, on revenue of $103.34 million for the same period in the prior year.

25.     The Q2 2012 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

26.     On November 9, 2012, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2012 (the "Q3 2012 10-Q").  For the quarter, FXCM reported net income of $4.51 million, or $1.70 per diluted share, on revenue of $113.79 million, compared to net income of $3.4 million, or $2.10 per diluted share, on revenue of $108.98 million for the same period in the prior year.

27.     The Q3 2012 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

28.     On March 18, 2013, FXCM filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012 (the "2012 10-K").  For the quarter, FXCM reported net income of $3 million, or $1.10 per diluted share, on revenue of $107.03 million, compared to net income of $3.23 million,

or $2.10 per diluted share, on revenue of $108.69 million for the same period in the prior year. For fiscal year 2012, FXCM reported net income of $8.96 million or $3.70 per diluted share, on revenue of $414.55 million, compared to net income of $12.74 million or $7.70 per diluted share, on revenue of $415.58 million for fiscal year 2011.

29.    In the 2012 10-K, FXCM stated, in relevant part:

> *We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks.* In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers and generate our trading revenues based on the volume of transactions and the spread earned on transactions.

(Emphasis added.)

30.    The 2012 10-K contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.    On May 10, 2013, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2013 (the "Q1 2013 10-Q"). For the quarter, FXCM reported net income of $6.86 million, or $2.30 per diluted share, on revenue of $122.05 million, compared to net income of $2.89 million, or $1.60 per diluted share, on revenue of $102.32 million for the same period in the prior year.

32.    The Q1 2013 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

10

33.     On August 8, 2013, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q2 2013 10-Q").  For the quarter, FXCM reported net income of $10.12 million, or $3.20 per diluted share, on revenue of $138.84 million, compared to a net loss of $1.44 million, or      $0.60 per diluted share, on revenue of $91.41 million for the same period in the prior year.

34.     The Q2 2013 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

35.     On November 12, 2013, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "Q3 2013 10-Q").  For the quarter, FXCM reported a net loss of $5.12 million, or $1.50 per diluted share, on revenue of $113.25 million, compared to net income of $4.51 million, or $1.70 per diluted share, on revenue of $113.79 million for the same period in the prior year.

36.     The Q3 2013 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37.     On March 17, 2014, FXCM filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "2013 10-K").  For the quarter, FXCM reported net income of $2.97 million, or $0.80 per diluted share, on revenue of $110.65 million, compared to net income of $3 million, or $1.10 per diluted share, on revenue of $107.03 million for the same period in the prior year.  For fiscal year 2013, FXCM reported net income of $14.83 million or $4.40 per diluted

share, on revenue of $481.92 million, compared to net income of $8.96 million or $3.70 per diluted share, on revenue of $414.55 million for fiscal year 2012.

38.     In the 2013 10-K, FXCM stated, in relevant part:

> **We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks.** In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. We earn trading fees and commissions by adding a markup to the price provided by the FX market makers

(Emphasis added.)

39.     The 2013 10-K contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40.     On May 12, 2014, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q").  For the quarter, FXCM reported net income of $2.08 million, or $0.53 per diluted share, on revenue of $82.83 million, compared to net income of $6.86 million, or $2.30 per diluted share, on revenue of $122.05 million for the same period in the prior year.

41.     The Q1 2014 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

42.     On August 8, 2014, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").  For the quarter, FXCM reported a net loss of $3.08 million, or $0.80 per diluted

share, on revenue of $71.99 million, compared to net income of $10.12 million, or $3.20 per diluted share, on revenue of $138.84 million for the same period in the prior year.

43.     The Q2 2014 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

44.     On November 7, 2014, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").  For the quarter, FXCM reported net income of $2.39 million, or $0.55 per diluted share, on revenue of $88.36 million, compared to a net loss of $5.12 million, or $1.50 per diluted share, on revenue of $113.25 million for the same period in the prior year.

45.     The Q3 2014 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

46.     On March 16, 2015, FXCM filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K").  For the quarter, FXCM reported net income of $15.76 million, or $3.46 per diluted share, on revenue of $101.75 million, compared to net income of $2.97 million, or $0.80 per diluted share, on revenue of $110.65 million for the same period in the prior year.  For fiscal year 2014, FXCM reported net income of $17.15 million or $3.90 per diluted share, on revenue of $351.05 million, compared to net income of $14.83 million or $4.40 per diluted share, on revenue of $481.92 million for fiscal year 2013.

47.     In the 2014 10-K, FXCM stated, in relevant part:

*We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business*

13

*philosophy because we believe that it aligns our interests with those of our customers and reduces our risks.* In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into offsetting trades with both the customer and the FX market maker. This agency model has the effect of automatically hedging our positions and eliminating market risk exposure. Generally, we earn trading fees through commissions or by adding a markup to the price provided by the FX market makers. In certain geographic locations, we provide our customers with the price provided by the FX market makers and display trading fees and commissions separately.

(Emphasis added.)

48.     The 2014 10-K contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

49.     On May 11, 2015, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). For the quarter, FXCM reported a net loss of $426.82 million, or $90.56 per diluted share, on revenue of $215.19 million, compared to net income of $2.08 million, or $0.53 per diluted share, on revenue of $82.83 million for the same period in the prior year.

50.     The Q1 2015 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

51.     On August 7, 2015, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). For the quarter, FXCM reported a net loss of $95.81 million, or $19.70 per diluted share, on revenue of $16.22 million, compared to a net loss of $3.08 million, or $0.80 per diluted share, on revenue of $71.99 million for the same period in the prior year.

52.     The Q2 2015 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

53.     On November 6, 2015, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, FXCM reported net income of $73.65 million, or $13.86 per diluted share, on revenue of $30.61 million, compared to net income of $2.39 million, or $0.55 per diluted share, on revenue of $88.36 million for the same period in the prior year.

54.     The Q3 2015 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

55.     On March 11, 2016, FXCM filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K").  For the quarter, FXCM reported a net loss of $104.95 million, or $19.29 per diluted share, on revenue of $67.35 million, compared to net income of $15.76 million, or $3.46 per diluted share, on revenue of $101.75 million for the same period in the prior year.  For fiscal year 2015, FXCM reported a net loss of $553.93 million or $108.89 per diluted share, on revenue of $402.28 million, compared to net income of $17.15 million or $3.90 per diluted share, on revenue of $351.05 million for fiscal year 2014.

56.     In the 2015 10-K, FXCM stated, in relevant part:

> *We primarily offer our customers what is referred to as an agency model to execute their trades. Our agency model is fundamental to our core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks.* In the agency model, when our customer executes a trade on the best price quotation offered by our FX market makers, we act as a credit intermediary, or riskless principal, simultaneously entering into

offsetting trades with both the customer and the FX market maker. This agency model has the effect of automatically hedging our positions and eliminating market risk exposure. Beginning in 2015, we began to offer a dealing desk, or principal, execution model to smaller retail clients. Under the dealing desk model, we maintain our trading position and do not offset the trade with another party on a one for one basis. CFDs are primarily a dealing desk offering. By combining smaller positions and trading them out on an aggregate basis, we are able to optimize revenues from accounts that are less actively traded. Generally, under both models, we earn trading fees through commissions or by adding a markup to the price provided by the FX market makers. In certain geographic locations, we provide our customers with the price provided by the FX market makers and display trading fees and commissions separately. Revenues earned under the dealing desk model also include our realized and unrealized foreign currency trading gains or losses on our positions with customers.

…

Standard

**With an FXCM Standard account, a client has access to 24/7 support, No Dealing Desk execution, and free access to DailyFX plus.** The Standard account offers Electronic Communication Network ("ECN")-style low commission pricing similar to stocks. Standard accounts have a $2,000 minimum.

(Emphasis added.)

57.     The 2015 10-K contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

58.     On May 5, 2016, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q").  For the quarter, FXCM reported net income of $49.74 million, or $8.88 per diluted share, on revenue of $71.52 million, compared to a net loss of $426.82 million, or $90.56 per diluted share, on revenue of $215.19 million for the same period in the prior year.

59.     The Q1 2016 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q1 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

60.     On August 5, 2016, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q").  For the quarter, FXCM reported net income of $60.40 million, or $10.78 per diluted share, on revenue of $70.56 million, compared to a net loss of $95.81 million, or     $19.70 per diluted share, on revenue of $16.22 million for the same period in the prior year.

61.     The Q2 2016 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

62.     On November 12, 2016, FXCM filed a quarterly report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  For the quarter, FXCM reported a net loss of $39.13 million, or $6.98 per diluted share, on revenue of $41.92 million, compared to net income of $73.65 million, or $13.86 per diluted share, on revenue of $30.61 million for the same period in the prior year.

63.     The Q3 2016 10-Q contained certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

64.     The statements referenced in ¶¶ 19-63 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) between September 4, 2009 through at least 2014, FXCM's U.S. subsidiary engaged in false and misleading solicitations of its foreign exchange customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk" platform had no inherent conflicts of

interest with the Company's customers; (ii) FXCM's U.S. subsidiary made false statements to the National Futures Association regarding the Company's relationship with the market maker; (iii) accordingly, FXCM had misled investors with respect to the Company's adverse position to its retail customers; and (iv) as a result of the foregoing, FXCM's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

65.     On February 6, 2017, the CFTC issued an order, fining FXCM and its founding partners, Dror Niv and William Ahdout $7 million for defrauding retail forex customers.  The CFTC order stated in relevant part:

> Washington, DC – The U.S. Commodity Futures Trading Commission (CFTC) today issued an Order filing and settling charges against Forex Capital Markets, LLC (FXCM), its parent company, FXCM Holdings, LLC (FXCM Holdings), and two founding partners, Dror Niv, and William Ahdout, who were, respectively, Chief Executive Officer of FXCM and Managing Director of FXCM, (collectively, Respondents). FXCM's principal place of business is New York, New York; Niv resides in Connecticut; and Ahdout resides in New York.

> *The CFTC Order finds that, between September 4, 2009 though at least 2014 (the Relevant Period), FXCM engaged in false and misleading solicitations of FXCM's retail foreign exchange (forex) customers by concealing its relationship with its most important market maker and by misrepresenting that its "No Dealing Desk" platform had no conflicts of interest with its customers. The Order finds FXCM, FXCM Holdings, and Niv responsible for FXCM making false statements to the National Futures Association (NFA) about its relationship with the market maker.*

> *The Order requires Respondents jointly and severally to pay a $7 million civil monetary penalty and to cease and desist from further violations of the Commodity Exchange Act and CFTC Regulations, as charged.* FXCM, Niv, and Ahdout agree to withdraw from CFTC registration; never to seek to register with the CFTC; and never to act in any capacity requiring registration or exemption from registration, or act as a principal, agent, officer, or employee of any person that is registered, required to be registered, or exempted from registration with the CFTC.

> **"The CFTC Is Committed to Protecting Customers from Harm in the Markets It Regulates"**

"Full and truthful disclosure to customers and honest discourse with self-regulatory organizations such as NFA are vital to the integrity and oversight of our markets," said Gretchen L. Lowe, Principal Deputy Director and Chief Counsel of the CFTC's Division of Enforcement. "Today's action's demonstrates that the CFTC is committed to protecting customers from harm in the markets it regulates."

FXCM is registered with the CFTC as a Futures Commission Merchant and Retail Foreign Exchange Dealer. FXCM has been providing retail customers with access to over-the-counter forex markets through a proprietary technology platform and has acted as counterparty in transactions with its retail customers in which customers can buy one currency and simultaneously sell another. Both Niv and Ahdout were CFTC registrants during the relevant period.

***FXCM, under Niv's and Ahdout's direction and control, misrepresented to its retail forex customers that when they traded forex on FXCM's No Dealing Desk platform, FXCM would have no conflict of interest, the Order finds.*** In addition, according to FXCM's marketing campaign, retail customers' profits or losses would have no impact on FXCM's bottom line, because FXCM's role in the customers' trades was merely that of a credit intermediary, the Order finds. ***FXCM further represented that the risk would be borne by banks and other independent "market makers" that provided liquidity to the platform, according to the Order.***

### FXCM's Undisclosed Interest

***Contrary to these representations, the Order finds, FXCM had an undisclosed interest in the market maker that consistently "won" the largest share of FXCM's trading volume – and thus was taking positions opposite FXCM's retail customers.*** FXCM, the Order finds, formulated a plan in 2009 to create an algorithmic trading system, using an FXCM computer program that could make markets to FXCM's customers, and thereby either replace or compete with the independent market makers on FXCM's "No Dealing Desk" platform. Although FXCM eventually spun off the algorithmic trading system as a new company, in actuality the company remained closely aligned with FXCM, according to the Order. This market maker received special trading privileges, benefitted from a no-interest loan provided by FXCM, worked out of FXCM's offices, and used FXCM employees to conduct its business, the Order further finds.

The Order finds that FXCM and the market maker agreed that the market maker would rebate to FXCM approximately 70 percent of its revenue from trading on FXCM's retail forex platform. In total, through monthly payments from 2010 through 2014, the company rebated to FXCM approximately $77 million of the revenue it achieved. However, FXCM did not disclose to customers, among other things, that this company – FXCM's principal market maker – was a startup firm spun off from FXCM, the Order further finds.

### False Statements to the NFA

19

*The Order also finds that FXCM willfully made false statements to NFA in order to conceal FXCM's role in the creation of its principal market maker as well as the fact that the market maker's owner had been an FXCM employee and managing director.* The Order finds that during a meeting between NFA compliance staff and FXCM executives, Niv omitted to mention to NFA the details of FXCM's relationship with the market maker.

*The Order holds Niv and Ahdout liable for FXCM's fraud violations as "controlling persons" who were responsible, directly or indirectly, for FXCM's violations. Niv is also held liable for FXCM's false statements to NFA as a controlling person who was responsible directly or indirectly for those violations.* FXCM Holdings is held liable for FXCM's fraud and false statement violations as principal of FXCM, the Order also finds.

The CFTC thanks NFA for its assistance in this matter.

(Emphases added.)

66.     On that same day, FXCM issued a press release, filed on Form 8-K with the SEC on February 7, 2017, entitled "FXCM US Reaches Settlement with NFA and CFTC," announcing the Company's withdrawal from U.S. markets.  In the press release, FXCM stated in relevant part:

NEW YORK, February 6, 2017-- FXCM Inc. (NASDAQ:FXCM) ("FXCM") today announced simultaneous regulatory settlements with the National Futures Association ("NFA") and the Commodity Futures Trading Commission ("CFTC") against its U.S. subsidiary, Forex Capital Markets LLC and certain of its principals. FXCM Holdings, LLC was also named in the CFTC settlement. The named FXCM entities and principals neither admit nor deny the allegations associated with the settlements. *The NFA settlement has no monetary fine, and the CFTC settlement has a $7 million fine.*

*FXCM will be withdrawing from business in the U.S. and has signed a non-binding letter of intent with GAIN Capital Holdings, Inc. ("GAIN") under which GAIN would purchase FXCM's U.S. customer accounts.* The transaction is subject to regulatory approval and a definitive agreement.  FXCM and GAIN are working to determine the timing for the account transfer and expect to provide further information in that regard in the coming days.  In 2016, FXCM's U.S. business had unaudited net revenues of approximately $48 million and generated an EBITDA[1] loss, but the costs associated with the business will not be transferring to GAIN.  There will be no changes to FXCM customers outside of the United States.

Withdrawing from this business will free approximately $52 million in capital.  Proceeds from the account sale and the release of capital will go toward the further repaying of FXCM's loan from Leucadia National Corporation.

FXCM will for the interim period continue to service its U.S. customers and to provide top quality trade execution pending the customer-account sale and business withdrawal.  FXCM will also be working diligently to be sure that an account transition to GAIN's retail brand, FOREX.com, will be orderly, expeditious and seamless.  FXCM wants to express its most sincere thanks to those U.S. customers who have been with FXCM over the years and wish you all the best of luck following this transition.

FXCM wants to stress that these settlements have no impact on any customer of FXCM's global businesses. FXCM and its global subsidiaries will continue to provide excellent execution and competitive pricing to its customers overseas through its award-winning technology, customer service and trading tools.

(Emphasis added.)

67.    On this news, FXCM's share price fell $3.40, or 49.64%, to close at $3.45 on February 7, 2017.

68.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

69.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired FXCM securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

70.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, FXCM securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can

be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by FXCM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

71.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

72.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

73.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of FXCM;

- whether the Individual Defendants caused FXCM to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of FXCM securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

74.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

75.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- FXCM securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold FXCM securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

76.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

77.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

78.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

80.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of FXCM securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire FXCM securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

81.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for FXCM securities.  Such reports, filings, releases and statements were

24

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about FXCM's finances and business prospects.

82.     By virtue of their positions at FXCM, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

83.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of FXCM, the Individual Defendants had knowledge of the details of FXCM's internal affairs.

84.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of FXCM.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to FXCM's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of FXCM securities was artificially inflated throughout the Class Period.  In ignorance of the adverse

25

facts concerning FXCM's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired FXCM securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

85.     During the Class Period, FXCM securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of FXCM securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of FXCM securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of FXCM securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

86.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

87.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

<u>**COUNT II**</u>

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

88.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

89.     During the Class Period, the Individual Defendants participated in the operation and management of FXCM, and conducted and participated, directly and indirectly, in the conduct of FXCM's business affairs.  Because of their senior positions, they knew the adverse non-public information about FXCM's misstatement of income and expenses and false financial statements.

90.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to FXCM's financial condition and results of operations, and to correct promptly any public statements issued by FXCM which had become materially false or misleading.

91.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which FXCM disseminated in the marketplace during the Class Period concerning FXCM's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause FXCM to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of FXCM within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of FXCM securities.

92.     Each of the Individual Defendants, therefore, acted as a controlling person of FXCM.  By reason of their senior management positions and/or being directors of FXCM, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, FXCM to engage in the unlawful acts and conduct complained of herein.  Each of the Individual

Defendants exercised control over the general operations of FXCM and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

93.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by FXCM.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 8, 2017                    Respectfully submitted,
                                           **POMERANTZ LLP**

                                           */s/ Jeremy A. Lieberman*
                                           Jeremy A. Lieberman
                                           J. Alexander Hood II
                                           Hui M. Chang
                                           600 Third Avenue, 20th Floor
                                           New York, New York 10016
                                           Telephone:  (212) 661-1100
                                           Facsimile:  (212) 661-8665
                                           Email:  jalieberman@pomlaw.com
                                                   ahood@pomlaw.com
                                                   hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.   I, _____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against FXCM Inc. ("FXCM" or the "Company") and, authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire FXCM securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.   I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired FXCM securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.   To the best of my current knowledge, the attached sheet lists all of my transactions in FXCM securities during the Class Period as specified in the Complaint.

6.   During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.   I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed _____02/08/17_____

**(Date)**

_____Ying Zhao_____

**(Signature)**

_____Ying Zhao_____

**(Type or Print Name)**

**FXCM INC. (FXCM)**                                                    **Zhao, Ying**

### LIST OF PURCHASES AND SALES

| DATE | PURCHASE<br>OR SALE | NUMBER OF<br>SHS/UTS | PRICE PER<br>SH/UT |
|------|---------------------|----------------------|--------------------|
| 5/22/2015 | Purchase | 10,000 | $1.2999 |
| 9/15/2015 | Purchase | 1,900 | $0.8040 |
| 10/2/2015 | Purchase | 310 | $8.0090 |
| 10/26/2015 | Purchase | 340 | $8.7510 |
| 10/3/2016 | Purchase | 230 | $8.5000 |
| 12/21/2016 | Purchase | 1,170 | $7.9000 |
| 12/10/2015 | Sale | 1,840 | $5.9000 |