UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 3/28/19

|  |  |
|---|---|
| IN RE GLOBAL BROKERAGE, INC. f/k/a FXCM INC. SECURITIES LITIGATION | Master File No. 1:17-cv-00916-RA<br><br>Nos. 1:17-cv-00916-RA<br>1:17-cv-00955-RA<br>1:17-cv-01028-RA<br>1:17-cv-02506-RA<br><br>OPINION & ORDER<br><br>CLASS ACTION |

RONNIE ABRAMS, United States District Judge:

Lead Plaintiffs 683 Capital Partners, LP and Shipco Transport Inc. and named Plaintiffs

Sergey Regukh and Brian Armstrong (collectively, "Plaintiffs") bring this class action suit

against Global Brokerage, Inc. f/k/a FXCM Inc. ("FXCM" or the "Company"), Dror Niv,

William Ahdout, and Robert Lande (collectively, "Defendants"), alleging that, from March 15,

2012 until February 6, 2017, Defendants committed securities fraud in violation of Sections

10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10(b)-5.  Specifically, Plaintiffs

allege that Defendants were responsible for false or misleading statements with respect to the

Company's purported agency-trading model and FXCM's relationship with another company,

Effex.

On August 3, 2017, Defendants moved to dismiss Plaintiffs' first amended complaint

pursuant to Federal Rules of Civil Procedure 12(f), 11(b)(3), and 12(b)(6).  This Court granted

the motion without prejudice, concluding that Plaintiffs had not adequately pleaded that

Defendants (1) were responsible for false statements or misrepresentations made to investors and

(2) had scienter with respect to these allegedly false statements or misrepresentations.

On April 6, 2018, Plaintiffs filed a second amended complaint ("SAC") in this action, which Defendants now move to dismiss. The motion is granted in part and denied in part. The Court dismisses Plaintiffs' claims against Defendant Lande. The Court concludes, however, that the second amended complaint adequately alleges that the remaining Defendants have committed securities fraud with respect to statements or omissions concerning FXCM's supposed agency-trading model, the Company's purported "order flow" payments with Effex, and Generally Accepted Accounting Principles ("GAAP"). The Court therefore denies the motion to dismiss as to Defendants FXCM, Niv, and Ahdout.

## BACKGROUND

### A.    Factual Background

The following facts, taken from the second amended complaint, are assumed to be true for the purposes of this motion. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

### 1.    The Parties

Defendant FXCM is a Delaware holding company headquartered in New York, New York that provides foreign exchange trading and related services to customers through various subsidiaries. *See* SAC ¶ 24. Defendant Dror Niv served as Chairman of the Company's Board of Directors from 2010 to 2017, and as the Company's Chief Executive Officer from 2009 to 2017. *See id.* ¶ 26. Defendant William Ahdout served as a Director of FXCM from 2010 to 2017, and as the Company's Chief Dealer and Managing Director from 1999 to 2017. *See id.* ¶ 27. Defendant Robert Lande served as the Company's Chief Financial Officer from at least 2012 to 2017. *See id.* ¶ 33.

2

Lead Plaintiffs 683 Capital Partners, LP and Shipco Transport Inc. and named Plaintiffs

Sergey Regukh and Brian Armstrong represent all persons and entities who purchased or

otherwise acquired publicly traded FXCM securities, including Class A common stock and

convertible senior notes between March 15, 2012 and February 6, 2017 (the alleged "Class

Period"). *See id.* ¶¶ 1, 22, 23.

### 2. FXCM's Agency-Trading Model

The forex, or foreign exchange market, is an over-the-counter market for the trading of

currencies. *See id.* ¶ 39-40.  It is the largest and most frequently traded financial market in the

world.  *See id* ¶ 39.  For this market to function, individuals and institutions must be able to buy

and sell different currencies at any time, in what are known as "spot transactions." *See id.* ¶ 40.

To make such transactions possible, currency traders rely on the presence of "market makers,"

who provide liquidity to the forex market by acting as dealers willing to continuously buy and

sell different currencies.  *See id.*

FXCM was founded in 1999 as an "online provider of foreign exchange (FX) trading and

related services." *Id.* ¶ 42.  Up to 2007, FXCM primarily employed what is known as a

"principal model," supplying liquidity to its retail forex customers through a so-called "dealing

desk." *Id.* ¶¶ 43, 154.  As part of its principal model, FXCM, like other typical market makers,

held positions opposite to those of its customers; that is, the Company would offer to buy and

sell customers' currencies at a particular price, with the hope that these currencies increased or

decreased contrary to their customers' positions. *See id.* ¶¶ 44-45.

In 2007, FXCM stated that it was transitioning from a principal model towards a so-

called "agency" or "no dealing desk" model. *See id.* ¶¶ 2, 44.  Whereas dealing desks will trade

against customers' positions, FXCM represented that its agency-trading model avoided such a

3

conflict of interest between itself and its customers. *See id.* ¶ 45. According to the Company, this worked by having FXCM act as a credit intermediary rather than as a typical liquidity provider. *See id.* As a credit intermediary, the Company would supposedly survey over a dozen market makers, and locate the best currency price for its customers. *See id.* ¶¶ 45-47. FXCM would then make money by adding a small markup to each bid/ask quote received from its customers and the liquidity provider with which it chose to do business. *See id.* ¶ 46. The Company also disclosed that it earned money from market makers through "order flow" payments, or payments made to FXCM for sending its customers' trades to these entities. *Id.* ¶¶ 46, 61, 150.

### 3. Effex

According to Plaintiffs, in 2009, Defendants Niv, Ahdout, and other FXCM personnel decided to take advantage of FXCM's clients by secretly subverting the Company's agency-trading model. *See id.* ¶ 49. To do so, Defendants allegedly developed a high frequency trading algorithm which would replace many of the independent market makers that FXCM surveyed for its customers and effectively allow FXCM to "cash in twice on its customers"; first on its mark-ups, and then supposedly based on kick-backs. *Id.*

In order to accomplish this alleged scheme, Defendants Niv and Ahdout hired a high-frequency trader, John Dittami, for a Managing Director position at FXCM. *See id.* ¶¶ 7, 50. According to Plaintiffs, Dittami was tasked with developing an algorithm that would steer the Company's customers not to independent market makers, but to a market maker that was controlled by FXCM. *See id.* In turn, Dittami was to be paid by the Company thirty percent of the trading profits generated by this algorithm, with the remaining seventy percent of profits going directly to the Company itself. *See id.* ¶¶ 49-51.

Allegedly following concerns from FXCM's compliance department that, despite its representations otherwise, FXCM would be trading against its customers' positions by utilizing this algorithm, in early 2010 Dittami "resigned" from the Company. *See id.* ¶¶ 52-54. Nevertheless, according to Plaintiffs, the relationship between Dittami and FXCM continued in several ways.   First, under FXCM's guidance, Dittami created a new company, Effex, which the Company funded with a $2 million interest-free loan. *See id.* ¶ 56.  Second, Defendants allowed Dittami to temporarily operate from FXCM's offices in New York, and, for a period of time, use the Company's servers and email systems. *See id.* ¶¶ 57-58.  According to Plaintiffs, by using FXCM's server, Effex saw "in real time which market makers or retail investors were bidding or offering on FXCM's platform, at what price and amounts" so that Effex could underbid them. *Id.* ¶ 58.

Finally, FXCM and Effex allegedly entered into monthly services agreements with Effex, which it misrepresented in the Company's public filings as order flow payments. *See id* ¶ 61. Based on this arrangement, Effex would make payments to the Company every month of $21 per million dollars of trading volume that Effex generated for FXCM, which, according to Plaintiffs, "roughly corresponded to the 70-30 split" that Dittami and FXCM had originally agreed to with the Company. *Id.* ¶ 55.  Beginning in September 2011, Plaintiffs state that these payments were adjusted to $16 per million "due to tightening spreads in the forex market that reduced Effex's profits." *Id.* ¶ 61.  According to Plaintiffs, this reduction was meant to compensate for Effex's lower profitability, and to maintain the agreed upon 70-30 split between the two entities. *See id.*

In turn, Plaintiffs allege that FXCM favored Effex over other market makers when taking orders from its customers.  Plaintiffs contend that FXCM did this in the following three ways: (1) allowing Effex to win all "ties" with other market makers; (2) continuing to provide Effex with a

real time view of price quotations offered by other liquidity providers; and (3) adding smaller markups to Effex's prices than to prices provided by other market makers. *See id.* ¶ 65. As a result, Plaintiffs contend that Effex routinely captured between 45 and 80% of FXCM's daily orders from its customers, which, from 2010 to 2014, amounted to nearly $80 million for the Company. *See id.* ¶ 70.

### 3. Regulatory Investigations

Around October 15, 2014, the U.S. Commodity Futures Trading Commission (the "CFTC") began investigating FXCM's business relations with Effex. *See id.* ¶ 74. Following its investigation, the CFTC announced, on February 6, 2017, that it was fining the Company $7 million and banning it from operating in the United States. *See id.* ¶ 79. According to a press release, the CFTC stated it had discovered that, "between September 4, 2009 though [sic] at least 2014," FXCM had concealed its relationship with Effex from its customers, thereby "misrepresenting that its 'No Dealing Desk' platform had no conflicts of interests with" these individuals. *Id.* Moreover, the CFTC reported that FXCM and Niv had made "false statements" or omissions to investigators about the Company's relationship with Effex, "as well as the fact that [this] market maker's owner had been an FXCM employee and managing director." *Id.*; *see also id.* (stating that "Niv omitted to mention to NFA the details of FXCM's relationship with [this] market maker"). Finally, the press release announced that CFTC had issued an Order (1) holding Niv and Ahdout liable for FXCM's fraud violations as "controlling persons" in the Company, (2) holding Niv liable for FXCM's false statements or omissions to CFTC investigators, and (3) finding FXCM's holding company, FXCM Holdings, liable for "fraud and false statement violations." *Id.*

On February 7, 2017, shares of FXCM's stock fell $3.40 per share, or over 49% from

6

FXCM's previous closing price. *See id.* ¶ 82.  That same day, the price of FXCM's Notes fell

37%, from a previous closing price of $43.698 to a closing price of $27.241. *See id.* ¶ 83.

Two weeks later, Niv resigned as CEO and from FXCM's Board of Directors. *See id.* ¶

85.  Shortly thereafter, FXCM officially changed its name to Global Brokerage Incorporated.

*See id.*  The Company no longer does business in the United States. *See id.* ¶ 84.

**B.     Procedural Background**

On February 7, 2017, various investors and noteholders in FXCM brought suit against

Defendants FXCM, Niv, Ahdout, Lande, and several other former employees in the Company

for securities fraud. *See* Orig. Compl.  On May 3, 2017, this suit was consolidated into a class

action complaint and 683 Capital Partners, LP and Shipco Transport Inc. were appointed as co-

lead Plaintiffs. *See* Dkt. 47.  In their first amended complaint, Plaintiffs alleged that, by failing

to disclose that its agency-trading model was not, in fact, conflict-free vis-à-vis FXCM's

customers, Defendants were responsible for false representations or omissions to their investors,

thereby violating Sections 10(b) and 20(a) of the Securities Exchange Act. *See* Am. Compl. at

69-72.

On August 3, 2017, Defendants moved to dismiss the first amended complaint for failure

to state a claim, or in the alternative, to strike several of the allegations therein. *See* Dkts. 88, 89.

On March 1, 2018, this Court granted Defendants' motion to dismiss the complaint in an oral

ruling. *See* March 1, 2018 Order.  The Court concluded that, among other deficiencies, Plaintiffs

had failed to "demonstrate with specificity why and how [Defendants'] individual statements are

false" and had not adequately alleged that Defendants acted with scienter. *See* First Oral Arg.

Transcript, Dkt. 109, at 13.  The Court nevertheless gave Plaintiffs an opportunity to detail their

allegations with greater specificity, granting its dismissal of the first amended complaint without

prejudice. *See id.* at 20-21.

On April 6, 2018, Plaintiffs filed a second amended complaint ("SAC"). *See* Dkt. 111. In its second amended complaint, Plaintiffs once again assert that Defendants FXCM, Niv, Ahdout, and Lande have violated Sections 10(b) and 20(a) of the Securities Exchange Act. *See id.* at 1, 6-8. After Defendants moved to dismiss the second amended complaint, *see* Dkt. 117, Plaintiffs opposed the motion, *see* Dkt. 122, and Defendants replied, *see* Dkt. 123. Oral argument in this case was held on March 6, 2019. *See* Dkt. 132.

## C.    The Second Amended Complaint

According to Plaintiffs' second amended complaint, FXCM's false and misleading statements can be grouped into five distinct categories.

### i.    False and Misleading Statements about FXCM's Agency-Trading Model and the Company's Order Flow Arrangement with Effex

Plaintiffs allege that, although Defendants submitted SEC filings stating that (1) they employed an agency-trading model and (2) they believed that this model eliminated any conflicts of interest with their customers, FXCM was, in reality, knowingly taking positions against these customers through its order flow relationship with Effex. *See* SAC at 35-39. Specifically, Plaintiffs point to allegedly false or misleading statements made in Defendants' 2011-2015 10-Ks, signed by Niv, Ahdout, and Lande, concerning the Company's purported agency-trading model and its oral flow arrangement with Effex, *see* SAC at 27-29:

- First, such filings stated that the Company "offer[ed] our customers what is referred to as an agency model to execute their trades." *Id.* ¶ 146. According to Plaintiffs, this statement was false and misleading because "FXCM did not primarily offer its customers an agency model due to its relationship with Effex." *Id.* ¶ 147.

- Second, such filings stated that the Company's "agency model is fundamental to our

core business philosophy because we believe that it aligns our interests with those of our customers and reduces our risks." *Id.* ¶ 146.  Plaintiffs assert that this statement was false and misleading because "the agency model did not, and Defendants did not believe it to, align FXCM's interests with its customers' interests nor reduce FXCM's risks." *Id.* ¶ 147.  This was because, according to Plaintiffs, Defendants knew of the Company's dealings with Effex, and Niv and Ahdout actively worked with Effex to help the Company profit from trading positions taken against those of FXCM's customers. *See id.*

- Third, such filings stated, with regard to the agency-trading model, that the Company "act[ed] as a credit intermediary, or riskless principal." *Id.* ¶ 146.  According to Plaintiffs, this statement was false and misleading because "FXCM was not using an agency model and was not acting solely as a credit intermediary or riskless principle." *Id.* ¶ 147.

- Fourth, such filings stated that FXCM earned "fees and commissions by adding a markup to the price provided by the FX market makers." *Id.* ¶ 146.  According to Plaintiffs, this statement was false and misleading because the Company was not simply receiving an added markup in price from customers, but "earning kickback payments from Effex that were tied directly to Effex's trading profits and losses." *Id.* ¶ 147.

- Fifth, such filings stated that retail trading was FXCM's "largest source of revenue," and "primarily driven" by order flow payments received from FX market makers based on the volume of customer trades that the Company sent their way. *Id.* ¶ 148. According to Plaintiffs, this statement was false and misleading because FXCM "did

not receive payments for order flow from any market makers," but "rather an approximation of 70% of Effex's profits and losses from its trades on the FXCM platform." *Id.* ¶ 149.

- Sixth, such filings stated that the Company "could suffer reputational damage and additional regulatory scrutiny by offering execution to retail clients that creates an inherent conflict between the interests of the customer and our interests." *Id.* ¶ 156. According to Plaintiffs, this statement was false and misleading because "FXCM was already risking reputational damage and regulatory scrutiny through its relationship with Effex," which, in fact, created a conflict between FXCM and its customers' interests. *Id.* ¶ 157.[1]

### ii.  False and Misleading Statements with Respect to GAAP

Plaintiffs further contend that the Company violated GAAP, "the common set of accounting principles, standards, and procedures that companies in the United States" are to "use to compile their financial statements." *See* SAC at 30, 31.  Specifically, Plaintiffs allege that FXCM violated GAAP in one of two ways:

- First, Plaintiffs state that FXCM violated GAAP by failing to disclose Effex as a Variable Interest Entity ("VIEs") in its 2011-2015 10-Ks, which were signed by Niv, Ahdout, and Lande, and various 10-Qs, which were signed by Niv and Lande. *See id.* ¶ 131, 32, 27-29. According to GAAP, an entity is a VIE when (1) "the nominal owners of the entity are unable to make decisions about the entity's activities that have a significant effect on the success of the entity," and (2) "when the nominal owners do not fully participate in the entity's residual returns." *Id* (citing

---

[1] Plaintiffs also cite substantively similar statements made in various 10-Q filings, which were signed by Niv and Lande.  *See* SAC at 36-39, 27-29.

Accounting Standards Codification ("ASC") 810-10-15-14).   Because Effex was

both "dependent on FXCM for its business," and "subject to FXCM's determination

as to whether its customers would be directed to book trades through Effex,"

Plaintiffs therefore contend that FXCM was required under GAAP to disclose this

entity as a VIE in its SEC filings. *Id.* ¶ 132.

- In the alternative, Plaintiffs assert that Effex should have been reported as a related

  party to FXCM in its public filings. *See id.* at 32.   According to GAAP, "[r]elated

  party transactions" include those between a company and its affiliates, with affiliates

  defined as "any company that, directly or indirectly through one or more

  intermediaries, controls, is controlled by, or is under common control with an

  enterprise." *Id.* ¶ 140 (citing ASC 850-10-05-3 and 850-10-20).   Because Effex was

  supposedly (1) started by FXCM, (2) funded with an interest-free loan from the

  Company, and (3) shared a close relationship with FXCM, Plaintiffs contend that the

  Company was required under GAAP to report Effex as a related party in its SEC

  filings. *Id.* ¶ 142-43.

### iii. False and Misleading Statements Concerning FXCM's Regulatory Inquiries

Third, Plaintiffs contend that Defendants were responsible for false and misleading

statements in FXCM's 2013-2015 10-Ks, signed by Defendants Niv, Ahdout, and Lande, and

certain of the Company's 10-Qs, signed by Defendants Niv and Lande, regarding the CFTC's

regulatory investigations of the Company. *See* SAC at 39, 27-29.

- First, Plaintiffs point out that, prior to its 2016 Q3, the Company continued to state

  that its business was "subject to extensive regulation, which may result in

  administrative claims, investigations and regulatory proceedings against [it]." *Id.* ¶

164.  According to Plaintiffs, these statements were false and misleading because, at

the time they were made, Defendants already knew that they were under

investigation by the CFTC, yet chose not to disclose such information in the

Company's filings. *Id.* ¶ 165.

- Second, Plaintiffs point to FXCM's statement in its 2016 Q3 that the CFTC was

   "currently examining the relationship with US [FXCM's United States subsidiary]

   and one of its liquidity providers." *Id.* ¶ 167 (brackets in original).  According to

   Plaintiffs, this statement was also misleading because it "significantly underplayed

   the extent of the CFTC and NFA's investigations into FXCM's relationship with

   Effex." *Id.* ¶ 168; *see also id.* (stating that, at this time, FXCM had signed a "Tolling

   Agreement" with the CFTC, and the Company was thus aware "that it was facing a

   high likelihood of imminent legal action from the regulators, far beyond a mere

   'examination'") (brackets omitted).

### iv.  False and Misleading SOX Certifications

Fourth, Plaintiffs point to certifications on the Company's SEC filings, signed by Niv and

Lande, which, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), stated that these filings

contained no "untrue [or misleading] statement of a material fact." SAC ¶ 169 (brackets in

original).  According to Plaintiffs, this certification was false and misleading because, as detailed

above, *supra.* at 8-10, (1) Defendants had lied about the nature of FXCM's relationship with

Effex, and (2) the Company had failed to disclose Effex as a VIE or related party in accordance

with GAAP, *see id.* at 10-11. *See* SAC at 41.

### v.  False and Misleading Statements Made Outside of Defendants' SEC Filings

Finally, Plaintiffs identify three statements made on FXCM's website that they allege

were false or misleading:

- In January 2013 and 2014, FXCM promoted its agency-trading model by stating that the Company "does not take a market position[,] [thus] eliminating a major conflict of interest" and that its agency-trading model did "not create a conflict of interest between [the customer] and FXCM because we aren't taking a market position." SAC ¶¶ 179-180.  According to Plaintiffs, such statements were false and misleading because (1) FXCM was not actually offering an agency-trading model, and (2) the Company, in fact, had a conflict of interest with its retail customers through its relationship with Effex.  *See id.* ¶ 185.

- Second, in January 2016, FXCM stated that, based on its agency-trading model, the Company "acts as a price aggregator," taking the best available bids from its liquidity providers and ensuring that the prices customers receive on their currency trades "are market-driven and fair."  *Id.* ¶ 182.  According to Plaintiffs, such statements were false and misleading because the Company's customers were not truly "receiving the best prices from market makers due to FXCM and Effex's market distortions."  *Id.* ¶ 185.

***

For the reasons that follow, the Court concludes that the second amended complaint plausibly alleges, with sufficient particularity, that Defendants FXCM, Niv, and Ahdout committed securities fraud with respect to statements relating to (1) the agency-trading model; (2) the Company's purported order flow arrangement with Effex; and (3) GAAP.  Plaintiffs have not satisfied the necessary standard, however, with respect to the statements relating to regulatory investigations of FXCM or with statements attributable to Defendant Lande.  As a

result, Defendants' motion to dismiss the second amended complaint is granted as against

Defendant Lande, but denied as to Defendants FXCM, Niv, and Ahdout.

## LEGAL STANDARD

### I. Standard of Review

#### A. Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must plead

"enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads

facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between

possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Under Rule 12(b)(6), the question is "not whether [the plaintiff] will ultimately prevail,"

but "whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v.

Switzer*, 562 U.S. 521, 529-30 (2011) (internal quotation marks omitted). In answering this

question, the Court must "accept[ ] all factual allegations as true, but giv[e] no effect to legal

conclusions couched as factual allegations." *Stadnick*, 861 F.3d at 35 (2d Cir. 2017) (quoting

*Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)). Additionally, courts may

consider any written instrument attached to the complaint as an exhibit or any statement or

documents incorporated in the complaint by reference. *See, e.g.*, *Hart v. FCI Lender Servs., Inc.*,

797 F.3d 219, 221 (2d Cir. 2015).

#### B. Motions to Dismiss Under Federal Rules of Civil Procedure 9(b) and the PSLRA

In addition to the requisite Rule 12(b)(6) pleading standards, Plaintiffs' allegations of

securities fraud are also subject to the heightened pleading requirements of Rule 9(b) of the

Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the

"PSLRA"), 15 U.S.C. § 78u-4(b). *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v.*

*J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Under this standard, a plaintiff

alleging fraud "must state with particularity the circumstances constituting" the alleged fraud.

Fed. R. Civ. P. 9(b). To do so successfully, "the plaintiff must '(1) specify the statements that

the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent.'" *Anschutz Corp. v.*

*Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d

164, 170 (2d Cir. 2004)).

The PSLRA expands on Rule 9(b) and requires "that securities fraud complaints specify

each misleading statement; that they set forth the facts on which a belief that a statement is

misleading was formed; and that they state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind.'" *Id.* (quoting *Dura Pharms.,*

*Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (internal quotation marks omitted)).

## C. Section 20(a) of the Securities Exchange Act

Section 20(a) of the Securities Exchange Act establishes that "[e]very person who,

directly or indirectly, controls any person liable under [the Exchange Act and its regulations]

shall also be liable jointly and severally with and to the same extent as such controlled person to

any person to whom such controlled person is liable." 15 U.S.C. § 78t(a). To state a Section

20(a) claim, a plaintiff must show (1) "a primary violation by the controlled person, (2) control

of the primary violator by the defendant, and (3) that the defendant was, in some meaningful

sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar*

*Fund, Ltd.,* 493 F.3d 87, 108 (2d Cir. 2007).

## DISCUSSION

I.  **Whether Plaintiffs Violated Section 10(b) and Rule 10b-5 of the Securities Exchange Act**

Under Section 10(b) of the Securities Exchange Act, it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange...[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5, promulgated by the SEC under Section 10(b), further provides that a person may not

> employ any device, scheme, or artifice to defraud[;]...make any untrue statement of a material fact or...omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[;] or...engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[;] in connection with the purchase or sale of any security.

Accordingly, to state a claim under § 10(b) and Rule 10b-5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Because Defendants exclusively challenge the first, second, and sixth factors in their motion, the Court addresses only these factors in its Opinion.

16

A.     **Whether Plaintiffs Adequately Allege that Defendants Were Responsible for False or Misleading Statements of Material Fact**

As described earlier, in their second amended complaint, Plaintiffs contend that Defendants were responsible for false or misleading statements of material fact with respect to the following five subjects: (1) FXCM's use of an agency-trading model; (2) FXCM's order flow arrangement with Effex; (3) FXCM's adherence to GAAP; (4) the status of the Company's regulatory investigations; and (5) FXCM's SOX certifications.

Under Rule 10b-5, it is unlawful to (1) "make any true statement of a material fact," or (2) "omit to state a material fact necessary in order to make the statements made...not misleading." 17 C.F.R. § 240.10b-5(b). In other words, to support a finding of liability under Rule 10b-5, there must be "an actual *statement* [] [made] that is either untrue outright or misleading by virtue of what it omits to state." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) (internal quotation marks omitted) (emphasis in original). Where one omits to make a statement entirely, this in-and-of-itself is not actionable. Rather, a "pure omission" is only "actionable under the securities laws [] when the corporation is subject to a duty to disclose the omitted facts." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (internal quotation marks omitted).

Nevertheless, "pure omissions," which are generally not actionable, differ from "half-truths,"—"statements that are misleading under the second prong of Rule 10b-5 by virtue of what they omit to disclose." *See S.E.C. v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds, Gabelli v. S.E.C.*, 568 U.S. 442 (2013). "The law is well settled [] that so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." *Id.* "The rule against half-truths, or statements that are misleading by omission, comports with the common-law tort of fraudulent misrepresentation,"

wherein "'a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation as if all the facts stated were untrue.'" *In re Vivendi*, 838 F.3d at 240 (quoting Restatement (Second) of Torts, § 529, cmt. *a* (1977)).

With respect to materiality, "a misrepresentation or omission is material when a reasonable investor would attach importance to it in making an investment decision." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 181 (S.D.N.Y. 2010).   However, "like the question of whether a reasonable investor would find a particular statement misleading…whether a reasonable investor would find a particular misrepresentation or omission material to an investment decision is usually a matter reserved for the trier of fact." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 609 (S.D.N.Y. 2017) (internal quotation marks omitted).   Consequently, "a complaint may not properly be dismissed…on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (internal quotation marks omitted).

### 1. Defendants' Statements with Respect to the Agency-Trading Model

Plaintiffs allege that FXCM falsely represented that it employed an agency-trading model.   *See* SAC at 35-38.   In particular, Plaintiffs assert that, although FXCM stated in its public filings that, in line with an agency-trading model, they acted as a "credit intermediary, or riskless principle" which "align[ed] [FXCM's] interests with those of [its] customers," the Company was, in fact, trading against its customers' interests through its relationship with Effex. *See id.* This is because, according to Plaintiffs, the Company would grant Effex special privileges over other market makers, *see id.*, and this entity would, in turn, make payments to

FXCM that it only disclosed in its public filings as standard order flow transactions, *see id.*; *infra.* at 21.

During the period in which Plaintiffs plead that the Company had an order flow arrangement with Effex, these allegations are sufficient to qualify as actionable. First, during this period, Plaintiffs state precisely which entity made the statements at issue, FXCM, and the context of these statements, which were made in various public filings that they identify. *See* SAC at 35-39; *see In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 474 (S.D.N.Y. 2006) ("Defendants argue that [Plaintiffs'] allegations are not pleaded with sufficient particularity. Yet Plaintiffs state precisely which entities made the statements and the context of those statements.")

Moreover, Plaintiffs make clear why the statements at issue were misleading or, at the very least, would qualify as half-truths. In the relevant filings, FXCM portrayed its agency-trading model as "fundamental to [its] core business philosophy," under which the company acted as a "credit intermediary, or riskless principle." SAC ¶ 146. If Plaintiffs' allegations are true, FXCM did not simply act as a mere "credit intermediary, or riskless principal," however. Rather, through the Company's arrangements with Effex, it profited from positions taken by this market maker directly against those of FXCM's customers. *See Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) ("[T]he Second Amended Complaint does more than identify rosy prediction or vague statements about [the defendant's] integrity; [the defendant] stated that such integrity 'was at the heart' of its business and attempted to distinguish itself from other institutions based on its 'truly independent investment research' while it allegedly knew the contrary was true."); *In re Inv. Tech. Grp.*, 251 F. Supp. 3d at 611 ("The statements at issue here are sufficiently definite, and moreover, related to 'the heart' of [the

defendant's] business to qualify as actionable."). In turn, FXCM allegedly provided benefits to Effex that were not reported to the Company's investors and customers, *see* SAC at 35-39, and which supposedly aided Effex in further capturing customer orders, *see id.*; *see In re Marsh*, 501 F. Supp. 2d at 476 (concluding that the plaintiffs had adequately pleaded that the defendant's statements were misleading where it had failed "to disclose that that it directed clients to insurers to maximize the [c]ompany's revenues under contingent company agreements, rather than to serve the clients' best interests...").

In response, Defendants assert that FXCM never told its customers that "it treated all liquidity providers equally." Defs.' Br. at 21. But this misses the point of Plaintiffs' allegations. If Plaintiffs' assertions are true, the Company acted wrongly not simply in favoring one market maker over others, but in leading customers to believe that it was not profiting from taking positions against its customers' interests. *See* Pls.' Opp. at 12 ("These statements were false and misleading because FXCM did not primarily offer its customers an agency model. Instead, customers trading on FXCM's supposed agency model on the NDD platform were unwittingly trading on a 'principal model' or dealing desk platform due to FXCM's secret profit-sharing relationship with Effex.") (citations omitted).[2]

---

[2] In their reply brief, Defendants also argue that FXCM's statement that it believed that the agency-trading model "aligns our interest with those of our customers and reduces our risks" was one of opinion, and is thus not actionable. Defs.' Reply at 1-2 (quoting SAC ¶ 146); *see Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015) (stating that "[a]n opinion statement...is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way"). As Plaintiffs correctly point out, however, Defendants only raised this argument in their reply brief, and, generally, "a court should not 'consider arguments that are raised for the first time in a reply brief.'" *Mateo v. Bristow*, No. 12 Civ. 5052 (RJS), 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 n. 5 (2d Cir. 2006)). In any event, FXCM stated that it offered its customers an agency-trading model, which "executes a trade on the best price quotation offered by our FX market makers," and that it acted as a "credit intermediary, or riskless principle." SAC ¶ 146. Such affirmative statements are not the expression of a belief, but characterizations of the Company's actual business practice, which, for the reasons described above, the Court concludes qualify as misleading. *See Omnicare*, 135 S. Ct. at 1325 ("A fact is 'a thing done or existing' or '[a]n actual happening.' An opinion is 'a belief, a view,' or a 'sentiment which the mind forms of persons or things.'" (quoting Webster's New International Dictionary 782 (1927)) (brackets omitted)).

The Court agrees with Defendants, however, that Plaintiffs have failed to plead that the Company's allegedly problematic relationship with Effex persisted past August 2014, when their order flow arrangement came to a halt. *See* SAC ¶ 162 (citing to, and declining to challenge the validity of the Company's statements from FXCM's 14Q3 10-Q and 2014 10-K that FXCM "no longer receive[d] payments for order flow").[3] Accordingly, the second amended complaint plausibly alleges that FXCM misled investors in its public filings with respect to its purported agency-trading model, but only from the beginning of the Class Period until the end of its order flow arrangement with Effex in August 2014.

## 2. The Order Flow Agreement

Plaintiffs next contend that Defendants were responsible for false and misleading statements with respect to the order flow arrangements themselves. SAC at 36-39. Specifically, Plaintiffs allege that, although Defendants represented these payments in their public filings as standard payments for order flow between FXCM and Effex based on customer transactions executed by Effex, they were, in reality, "an approximation of 70% of Effex's profits and losses from its trades on the FXCM platform." *Id.* ¶ 163. According to Plaintiffs, by portraying these payments as for order flow rather than as profit-sharing agreements, Defendants effectively hid the extent of the Company's relationship with Effex from its customers and investors. *See* SAC at 36-39; *see* Pls.' Opp. at 14 (stating that the "sham 'order flow' payments—a mere façade to hide the profit-based kickbacks from Effex to FXCM—were part and parcel of FXCM's scheme to drive customer orders to Effex in order to maximize FXCM's profits").

_____

[3] At oral argument, Plaintiffs' counsel stated that, according to the CFTC, the Company's relationship with FXCM "continued through at least 2014," *see* Oral Arg. Tr. at 17, and that the FXCM website listed FXCM as a liquidity provider until "recently," *id.* at 23. Counsel did not raise these points in its brief, however, and, at oral argument, even conceded that these two facts were "pretty thin" support for the existence of a relationship between FXCM and Effex past August 2014. *Id.* at 23.

The Court concludes that, at this stage of the proceedings, Plaintiffs have sufficiently alleged that FXCM's public misstatements about these payments were at the very least misleading.   First, Plaintiffs assert that FXCM represented in its public filings that income earned on these order flow payments was "received from certain FX market makers in exchange for routing trade orders to these firms for execution." SAC ¶ 150. Defendants do not appear to dispute, however, that FXCM was only receiving order flow payments from a single market maker, Effex, to whom, in turn, it would provide inside advantages over other liquidity providers, an arrangement that Defendants did not reveal to the Company's customers or investors. See SAC at 36-39. Plaintiffs also allege that these payments approximated "Effex's profits and losses from its trades on the FXCM platform." SAC ¶ 149. According to Plaintiffs, these payments were thus not simply based on customer orders executed by Effex (as FXCM supposedly led its customers and investors to believe), but were part of a broader arrangement between the two entities that Effex would be given special advantages to help capture customer orders, Effex (as a market maker) would then take positions against these customers, and FXCM would receive profits from Effex.  Indeed, this is further supported by the factual allegation that the amounts allocated in these so-called order flow payments approximated the profit-sharing arrangement percentages originally agreed to between FXCM and Dittami. *See id.* ¶ 51 (stating that, before formally departing FXCM, Dittami was to be paid by the Company a base salary of thirty percent of the profits generated by his trading algorithm, with the remaining seventy percent of profits going directly to FXCM itself).

In response, Defendants assert that these monthly payments (1) ceased after August 1, 2014, (2) are standard in the industry, (3) did not need to be disclosed under SEC rules, and (4) did not violate any specific regulatory requirements. Defs.' Br. at 20-21; Defs.' Reply at 3-5.

22

As addressed earlier, Plaintiffs do not appear to challenge that the order flow payments ceased after August 2014. *See* SAC ¶ 162; *supra.* at 21.  Nevertheless, in the Company's 14Q3 10-Q and 2014 10-K, FXCM continued to address these payments as for order flow, *see* SAC ¶ 162, which—for the reasons described above—Plaintiffs have adequately pleaded was misleading.

As for Defendants' remaining arguments, they ignore the thrust of Plaintiffs' allegation here:  Regardless of whether FXCM's arrangement with Effex was standard in the industry and was in compliance with the relevant regulatory requirements, if Plaintiffs are correct, FXCM may have misled their customers by portraying such payments as order flow payments rather than as a profit-sharing arrangement with Effex. *See In re. Inv. Tech. Grp.*, 251 F. Supp. 3d at 612 ("Based on the Complaint, the key fact omitted from [the defendant's] statements about its business practices is [a subsidiary's] ongoing misconduct related to customer information, not that [the defendant] operated a proprietary trading program.").

Consequently, Plaintiff has adequately alleged that the Company's public statements with respect to order flow payments with Effex were false or misleading.

### 3. GAAP

Plaintiffs next allege that FXCM's financial statements violated GAAP in at least one of two ways.  First, Plaintiffs assert that these statements violated GAAP by failing to disclose that Effex was a Variable Interest Entity ("VIE"), which would have required it to consolidate this entity. *See* SAC at 31-32.  Alternatively, Plaintiffs contend that, even if FXCM was not required to report Effex as a VIE, it was required under GAAP to disclose its transactions with Effex as a "related party." *See id.* at 32-34.

The Court concludes that Plaintiffs have adequately alleged that the Company omitted material statements with respect to GAAP. As Plaintiffs note in their second amended complaint, a company must disclose and consolidate another entity as a VIE "when one or more of several criteria are met, including, among others, (1) when the nominal owners of the entity are unable to make decisions about the entity's activities that have a significant effect on the success of the entity, and (2) when the nominal owners do not fully participate in the entity's residual returns." SAC ¶ 131 (citing ASC 810-10-15-14). *See In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 414 (S.D.N.Y. 2013) ("[A]n enterprise is a VIE's primary beneficiary if the enterprise has [t]he power to direct the activities of [a VIE] that most significantly impact the [VIE's] economic performance, and has either [t]he obligation to absorb losses of the [VIE] that could potentially be significant to the [VIE] or the right to receive benefits from the [VIE] that could potentially be significant to the [VIE].") (internal quotation marks omitted) (brackets in original); *see also Yates v. Municipal Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014) ("[A] company must consolidate onto its financial statements the assets and liabilities of a VIE if the company is its 'primary beneficiary,' that is, if the company absorbs the majority of the risks and rewards associated with the VIE."). As described earlier, Plaintiffs allege that, "by agreement, FXCM received 70% of Effex's profits," and was "dependent on FXCM for its business." *See* SAC ¶ 132; *supra.* at 21. If true, this would strongly suggest that the Company violated GAAP by not disclosing Effex as a VIE and consolidating this entity.[4]

---

[4] Because the Court determines that Plaintiffs have adequately pleaded that Effex would qualify as a VIE, it does not address their alternative claim that it would qualify as a related party. *See* SAC at 32-34.

In response, Defendants make two principal arguments. First, they contend that "'naked assertions' of GAAP violations," standing alone, are not enough to state a securities fraud claim. Defs.' Br. at 17.[5]   According to Defendants, this is especially true "where, as here, there has been no restatement by FXCM during the Class Period." *Id.*   In all of the cases that Defendants point to in support of these propositions, *see id.*, however, the alleged accounting violation, *by itself,* was the basis for, or not directly connected to, the plaintiff's adequately pleaded claims of securities fraud. *See ECA*, 553 F.3d at 200 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim...") (internal quotation marks omitted); *see also Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155 (S.D.N.Y. 2015), *City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Grp. Pub. Ltd. Co.*, 655 F. Supp. 2d 262 (S.D.N.Y. 2009); *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168 (S.D.N.Y. 2012); *In re Marsh*, 501 F. Supp. 2d 452; *In re Fannie Mae*, 742 F. Supp. 2d 382 (S.D.N.Y. 2010).   Here, by contrast, Plaintiffs adequately allege several misrepresentations or omissions, *see supra.* at 18-23, the effect of which may have directly resulted in a GAAP violation.   In other words, Plaintiffs do not rely on the alleged GAAP violations alone in stating their claim for securities fraud.   Rather, they succeed in stating a claim for securities fraud based on the agency-model and order flow statements, which, if true, would also have required them to make certain accounting disclosures.

Second, Defendants point out that the CFTC made no findings that FXCM violated GAAP. *See* Defs.' Br. at 18-19.   In support of this argument, Defendants point to the agency's

---

[5] The Court notes that this defense is typically raised to show a lack of scienter. *See, e.g., Novak v. Kasaks,* 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim.   Only where such allegations are coupled with evidence of corresponding fraudulent intent, might they be sufficient.") (internal quotation marks and citations omitted).   In any event, as explained in the next section, *see infra.* at 29-34, Plaintiffs have pleaded sufficient evidence of "corresponding fraudulent intent" to impute scienter to Defendants Niv, Ahdout, and FXCM at this stage.

statement that John Dittami "was the principal and *100 percent owner of [Effex]*" and note that

the CFTC made no allegations that FXCM had any voting power over this entity, which,

according to them, undercuts Plaintiffs' claim that Effex should have been reported as a VIE. *Id.*

(italics in original) (brackets in original).   But Plaintiffs do not dispute that Dittami formally

owned Effex or that FXCM had any official voting power over this entity.   Instead, Plaintiffs

allege that, through the two companies' purported order flow arrangement, FXCM directed the

majority of Effex's business, thereby qualifying the latter entity as a VIE.   SAC ¶ 132 ("Effex

was dependent on FXCM for its business and subject to FXCM's determination as to whether its

customers would be directed to book trades through Effex."); *id.* at ¶ 71 ("The bulk of Effex's

revenues were earned in transactions through FXCM.   However, Effex was only able to

profitably transact with other ECN's [sic] because of the pricing and order information that

FXCM secretly provided to Effex. Thus, Effex was wholly dependent on FXCM").   Such

allegations may ultimately prove false.   At this stage of the proceedings, however, the Court will

not weigh in on this factual dispute.   *See In re Ambrac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d

241, 273 (S.D.N.Y. 2010) ("The parties' disagreements over GAAP compliance also raise issues

of fact that cannot be resolved on a motion to dismiss."); *In re Global Crossing, Ltd. Sec. Litig.*,

322 F. Supp. 2d 319, 338-41 (S.D.N.Y. 2004) (stating that further development of the record was

needed where the plaintiffs "raised allegations sufficient to call into question...the [defendants']

compliance with specific GAAP provisions").

Accordingly, the Court concludes that Plaintiffs have adequately alleged the Company

made false representations or omissions with respect to GAAP during the time of the Company's

order flow arrangement with FXCM.   Because Plaintiffs have provided no allegations that the

relationship between these two entities continued after August 2014, however, *see supra.* at 21,

23, Plaintiffs have failed to plead that Defendants were responsible for misstatements or omissions in violation of GAAP with respect to events past that date.

### 4. Regulatory Investigations

Plaintiffs next allege that FXCM committed securities fraud by failing to disclose that regulators were investigating its financial relationship with Effex. *See* SAC at 39-40. In support of this assertion, Plaintiffs cite to Defendants' statements in their public filings that FXCM's business was "subject to extensive regulation, which may result in administrative claims, investigations and regulatory proceedings against [it]." *Id.* ¶ 164. According to Plaintiffs, when making this statement, Defendants were aware that the Company was being investigated by regulators, yet "created the false and misleading impression that [FXCM] was not *currently* under regulatory investigations." *Id.* ¶ 165 (emphasis in original).

Plaintiffs do not allege sufficient facts to establish that FXCM's decision not to disclose its regulatory investigations constituted a false or misleading statement of material fact. As Plaintiffs acknowledge, *see* Pls.' Opp. at 21, there is no independent duty for a company to disclose that it is being investigated by a regulatory agency. *See, e.g.*, *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 15 (S.D.N.Y. 2016). In response, Plaintiffs rightly point out that if a company chooses to speak about being under investigation, it must speak truthfully about material issues. *See* Pls.' Opp. at 21 (citing *Lions Gate,* 165 F. Supp. 3d at 15). But courts in this district have repeatedly held that this obligation is only triggered by an "express prior disclosure." *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012). With respect to the statement at issue here, that FXCM's business was "subject to extensive regulation," the Company had made no express prior disclosure that this was not the case, nor have Plaintiffs alleged otherwise. *See In re Invest. Tech. Grp.*, 251 F.

Supp. 3d at 616 ("The initiation and ongoing nature of the SEC investigation did not make [the defendant's] statements that it was 'regularly' or 'periodically' involved in regulatory investigations and matters factually inaccurate. Nor could those statements have given a reasonable investor the impression that [the defendant] was not actively involved in investigations.").

Plaintiffs also point to the Company's statement in its 2016 Q3 10-Q that "[t]he CFTC and the NFA are currently examining the relationship with US [FXCM's United States subsidiary] and one of its liquidity providers." SAC ¶ 167. According to Plaintiffs, this later representation was misleading because it "downplayed these investigations as "benign examinations, rather than acknowledging the high likelihood of imminent legal action demonstrated by [FXCM's] tolling agreement [with the CFTC]." Pls.' Opp. at 20. Plaintiffs are correct that, in light of this express disclosure, the Company was required to speak truthfully about any ongoing investigations that it was undergoing. *See Lions Gate*, 165 F. Supp. 3d at 15. The statement at issue made clear, however, that the Company was indeed being scrutinized by regulatory agencies. *Cf. Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC,* 164 F. Supp. 3d 568, 584 (S.D.N.Y. 2016) (stating that plaintiffs had plausibly alleged that the corporate defendant had misled investors where it had "suggest[ed] that the company was not facing an investigation that could have a material impact on its business, when, in fact, it was facing such an investigation"). Moreover, no charges or findings had been made against FXCM at the time of this statement. Nor do Plaintiffs explain how the Company's tolling agreement with federal regulators made legal action highly likely or imminent. As courts in this district have repeatedly held, companies do not have an affirmative duty "to speculate or disclose uncharged, unadjudicated wrongdoings or mismanagement," *see In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *31 (internal quotation

marks omitted), or to "accuse [themselves] of wrongdoing," *Lions Gate*, 165 F. Supp. 3d at 15 (internal quotation marks omitted).

Thus, the Court concludes that Plaintiffs have failed to allege that FXCM made false or misleading statements with respect to the regulatory investigations that it was undergoing.

### 5. SOX

Finally, Plaintiffs allege that Defendants Niv and Lande made false and misleading SOX certification statements by representing that everything in their public filings was accurate. *See* SAC at 40-42. SOX certifications do not "constitute a standalone basis for liability." *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 517 (S.D.N.Y. Sept. 29, 2017). Because Plaintiffs have not adequately alleged that FXCM made false or misleading statements with regard to the regulatory investigations of the Company, Defendants Niv and Lande cannot be held liable for their SOX certifications with regard to these subjects. Nevertheless, because Plaintiffs have sufficiently alleged that the Company made false or misleading statements regarding FXCM's employment of its agency-trading model, the order flow payments, and with regard to GAAP, Defendants Niv and Lande's SOX certifications with respect to these subjects may be actionable. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 655 (S.D.N.Y. 2017) (finding that, "[t]o the extent that the Court finds Plaintiff to adequately have alleged that [the defendant] made any actionable misstatements or omissions in [its public filings] [and with scienter]…Plaintiff may proceed on any such misstatement or omission and this portion of [the defendant's] SOX certification").

### B.     Whether Plaintiffs Adequately Allege that Defendants Acted with Scienter

Ultimately, it is not enough for Plaintiffs to plausibly allege that Defendants made misrepresentations or omissions in the Company's securities filings with respect to the agency-

trading model, FXCM's order flow payments with Effex, or GAAP. Plaintiffs must also adequately allege that each Defendant acted with scienter when making the false or misleading statements or omissions. "[T]he scienter requirement is met where the complaint alleges facts showing either: 1) a motive and opportunity to commit the fraud; or 2) strong circumstantial evidence of conscious misbehavior or recklessness." *Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (internal quotation marks omitted).

To allege sufficient facts under the "motive and opportunity" test, a plaintiff may show that the defendant "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08. Absent a showing of motive, plaintiffs may demonstrate scienter under the "strong circumstantial evidence" test, but "the strength of the circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)). The circumstantial evidence that can support an inference of conscious misbehavior or recklessness includes situations in which defendants: "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Emps. Ret. Sys.*, 794 F.3d at 306 (internal quotation marks omitted). Under Second Circuit case law, the recklessness required to plead scienter under this test "mean[s] 'conscious recklessness—i.e., a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*.'" *S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (S.D.N.Y. 2009) (quoting *Novak*, 216 F.3d at 312) (emphasis in original).

Furthermore, the PSLRA requires that a plaintiff must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). In *Tellabs, Inc. v.*

30

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007), the Supreme Court concluded that "[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." "In other words, it is not enough to set out facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (internal quotation marks omitted). Instead, a plaintiff pleads scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 550 U.S. at 324.

### 1. Scienter with Respect to the Individual Defendants

Plaintiffs have alleged sufficient facts that Defendants Niv and Ahdout possessed scienter with respect to FXCM's purported misstatements or omissions. As noted above, a strong inference of scienter may arise where a complaint alleges with specificity that defendants "knew facts or had access to information suggesting that their public statements were not accurate." *ECA*, 553 F.3d at 199 (internal quotation marks omitted); *see also In re Inv. Tech.*, 251 F. Supp. 3d at 620 (plaintiffs may adequately attribute scienter to defendants where they have specifically alleged that the "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation") (quoting *Novak*, 216 F. 3d at 308).

Here, the second amended complaint alleges that Niv and Ahdout were heavily involved in the creation and funding of Effex, something that Defendants do not appear to deny, and that these two individuals "devised a plan to take advantage of FXCM's NDD clients through the use of a high frequency trading algorithm." SAC ¶ 49. Furthermore, the second amended complaint alleges that Niv and Ahdout hired Dittami to create this algorithm, provided him with start-up

capital, and oversaw Effex's eventual spin-off from FXCM and the construction of the purported order flow payments between these two companies. *See id.* at 12-18, 30-31; *see Vanleeuwen v. Keyuan Petrochems., Inc.*, No. 13 Civ. 6057 (PAC), 2014 WL 3891351, at *3 (S.D.N.Y. Aug. 8, 2014) ("Plaintiffs have plausibly alleged 'conscious misbehavior or recklessness' by pleading facts indicating that Li was aware of the third-party transactions and failed to disclose them."). Plaintiffs also produce relevant portions of the CFTC's press release banning FXCM from operating in the U.S. and entered against these two individuals, *see* SAC ¶ 79, which accuses the Company, "under Niv's and Ahdout's direction and control," of making misrepresentations to regulatory agencies concerning its relationship with Effex, *see id.* ("Contrary to these representations, the Order finds, FXCM had an undisclosed interest in the market maker that consistently 'won' the largest share of FXCM's trading volume – and thus was taking positions opposite FXCM's retail customers."). Finally, and although this factor is not dispositive, *see infra.* at 33, throughout the entire time of the alleged Class Period, Niv served as Chief Executive Officer and Chairman of the Board of FXCM and Ahdout as Chief Dealer and a Managing Director, *see id.* ¶¶ 26-27, positions which would have presumably put both individuals in close contact with Effex and in which they likely would have been well aware of the Company's arrangements with this entity.

As a result, Plaintiffs plausibly allege that these Defendants "knew facts or had access to information suggesting" that the Company's portrayal of its agency-trading model and financial arrangements with Effex were "not accurate." *Novak*, 216 F.3d at 311. *See In re Inv. Tech.*, 251 F. Supp. 3d at 621 (stating that, where the plaintiff "plausibly alleg[ed] that [the individual defendant] knew facts or had access to information suggesting that" his company's financial statements were not accurate, "[t]hese allegations alone [were] enough to satisfy the pleading

requirement for scienter") (internal quotation marks omitted); *In re Alstom SA*, 406 F. Supp. 2d 433, 459 (S.D.N.Y. 2005) (stating that the defendants' role "in the day-to-day operations of the company," as well as allegations of their involvement in the misleading finance arrangements at issue, the prominence of these financial arrangements, and "the significant length of time (several years) during which the [fraudulent] arrangements were not disclosed…could enable a reasonable fact finder to draw a strong inference of recklessness"); *In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *8 (S.D.N.Y. Aug. 31, 2000) (stating that the plaintiffs' allegation that individual defendants acted with fraudulent intent was supported by the fact that they were "directly involved in arranging the illegal price-fixing agreement").

Plaintiffs have not alleged sufficient facts to attribute scienter to Defendant Lande, however.  First, Plaintiffs allege that, as CFO, Lande must have been aware that the supposed order flow payments between FXCM and Effex were actually profit-sharing agreements.  *See* SAC ¶ 63.  "It is well established," though, "that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient," standing alone, "to plead scienter."  *In re Sotheby's Holdings*, 2000 WL 1234601, at *7 (quoting *Novak*, 216 F.3d at 309).

Plaintiffs also provide a quotation from an anonymous employee that "Niv, Ahdout, [and] to a lesser extent, CFO Robert Lande had control over Effex Capital."  SAC ¶ 72.  Other than this isolated statement, Plaintiffs do not allege in what manner Lande was involved with or had contact with Effex.  Based on the paucity of information in their pleadings concerning Defendant Lande's actual or presumptive knowledge that FXCM's public statements were not

accurate with regard to Effex, the Court therefore concludes that Plaintiffs have not plausibly pleaded scienter with respect to this Defendant.[6]

## 2. Corporate Scienter

Plaintiffs have also adequately alleged scienter with respect to FXCM. "A misrepresentation may be attributed to a corporate defendant if it was made by or on behalf of the corporation." *E.g.*, *In re Sotheby's*, 2000 WL 1234601, at *5; *see also Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."). Here, Niv and Ahdout's scienter may be imputed to FXCM. *See In re Marsh*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants."); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017) ("[B]ecause the SAC properly alleges scienter against two key officers of Eletrobras, it necessarily alleges scienter against Eletrobras itself."); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (attributing the scienter of its Vice Chairman, a Vice President, and a Managing Director to the corporate defendant).

---

[6] Because Plaintiffs have adequately alleged scienter with respect to Defendants Niv and Ahdout, the Court does not consider whether scienter can also be attributed to them under the "core operations" doctrine. *See* Pls.' Opp. at 31; *see In re Atlas Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 490 (S.D.N.Y. 2004) ("Knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued."). Relatedly, scienter cannot be impugned to Defendant Lande under this theory alone. *See In re Inv. Tech.*, 251 F. Supp. 3d at 624 ("[R]eliance on a 'core operations' inference may provide 'supplemental support' for establishing scienter, but is not independently sufficient.") (citing *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n. 13 (2d Cir. 2011)); *see also Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015).

Accordingly, the Court concludes that Plaintiffs have adequately alleged that the Company acted with scienter with respect to its purportedly false statements or omissions.[7]

## C.  Whether Plaintiffs Adequately Allege Loss Causation

In order to satisfy a claim under Rules 10(b) and 10b-5, Plaintiffs must also show loss causation. Loss causation—"a concept analogous to the common law concept of 'proximate cause'"—demands that plaintiffs "show that [their] loss was caused by the fraud and not by other intervening events." *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d at 397. In other words, one must show "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill & Co., Inc.*, 396 F. 3d 161, 173 (2d Cir. 2005). In particular, a plaintiff must allege either: (1) "facts sufficient to report an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss," *id.* at 177, or (2) "facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [the defendant's] misstatements," *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007).

Defendants contend that, during the alleged Class Period, a "[f]lash [c]rash" caused a 90% decline in FXCM's share price, and that the Company's loss in value immediately following the disclosure of Defendants' alleged fraud therefore cannot be exclusively attributed to the latter event. *See* Defs.' Br. at 32-33. This argument fails.

---

[7] Defendants also argue that, even if the Court were to find that they made statements with the intent to mislead FXCM's customers, these statements were not made to deceive the Company's shareholders and therefore do not constitute securities fraud. This argument is unavailing. First, it is undisputed that the misrepresentations at issue were in the Company's public filings, and thus made to FXCM's investors in connection with the purchase or sale of securities. Second, Defendants cite no case law suggesting that, because FXCM primarily sought to deceive its customers, this somehow negates their liability for misrepresentations made to investors. If the investors had known the truth, Plaintiffs argue, they would not have invested in the Company. Finally, the investors were purportedly injured as a result of the drop in share price following disclosure of the underlying fraud. *See infra.* at 36.

First, as Plaintiffs correctly point out, the flash crash took place in January 2015, and the stock drop alleged in the second amended complaint occurred on February 7, 2017. *See* Pls.' Opp. at 32-33; SAC ¶¶ 82-83. Although "the prospect that the plaintiff's loss was caused by the fraud decreases" where the "plaintiff's loss coincides with a marketwide phenomenon causing losses to other investors," *Lentell*, 396 F.3d at 174, here the flash crash happened over two years before the stock drop. In other words, this event can hardly be said to "coincide" with the disclosure of the purported fraud. *Cf. City of Westland Police & Fire Ret. Sys. v. Metlife, Inc.*, 928 F. Supp. 2d 705, 714-15 (S.D.N.Y. 2013) (determining that a market upheaval and corrective disclosure coincided where these events took place on the same day).

Second, based on Plaintiff's allegations, there is little doubt that the regulatory settlement's disclosure of FXCM's purported fraud, and its order that FXCM effectively stop doing business within the United States, had an immediate and tangible effect on the Company's value. The second amended complaint plainly alleges that shares of FXCM's stock fell over 49% and FXCM's Notes fell 37% the day after the settlement's announcement. *See* SAC ¶¶ 81-83. To satisfy loss causation on a motion to dismiss, this is more than sufficient. *See Marsh & Mclennan*, 501 F. Supp. 2d at 490 ("Plaintiffs allege that upon the filing of the NYAG complaint, in which contingent commission revenues were alleged to be the result of improper business practices, MMC's stock price lost a third of its value in two days. That is all that is required at this stage."); *Acticon AG v. China North E. Petro. Holdings Ltd.*, 692 F.3d 34, 40 (2d Cir. 2012) (Plaintiffs satisfied the pleading requirement where they "allege[d] that the price of NEP stock dropped after the alleged fraud became known.").

36

For these reasons, the Court concludes that Plaintiffs have adequately alleged that

FXCM's drop in stock price was caused by the regulatory investigations' disclosure of

Defendants' purported fraud, and that Plaintiffs have properly pleaded loss causation.

**II.      Whether Plaintiffs Adequately Allege that Defendants Violated Section 20(a) of the Exchange Act**

Finally, Plaintiffs allege that all of the individual Defendants should be held separately

liable as "control persons" under Section 20(a) of the Exchange Act. *See* SAC at 52-54.

Section 20(a) of the Exchange Act provides that

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be
> liable jointly and severally with and to the same extent as such controlled
> person to any person to whom such controlled person is liable..., unless the
> controlling person acted in good faith and did not directly or indirectly
> induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). "In order to establish a prima facie case of controlling-person liability, a

plaintiff must show a primary violation by the controlled person and control of the primary

violator by the targeted defendant, and show that the controlling person was in some meaningful

sense a culpable participant in the fraud perpetrated by the controlled person." *S.E.C. v. First*

*Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (internal quotation marks, brackets, and

citations omitted).[8]

In this case, Plaintiffs have made a prima facie showing of controlling-person liability

with regard to Defendants Niv and Ahdout.   First, these Defendants clearly qualify as "control

persons." *Id.* at 1472-73 (2d Cir. 1996) ("Control over a primary violator may be established by

---

[8] Judges in this district disagree as to "whether the culpable participation element is a scienter requirement that must
be affirmatively pleaded at the motion to dismiss stage." *In re ShengdaTech, Inc. Sec. Litig.*, No. 11-CV-1918
(LGS), 2014 WL 3928606, at *10 n.1 (S.D.N.Y. Aug. 12, 2014).   As this Court has stated previously, it agrees "with
the majority of judges in this district that plaintiffs must plead culpable participation in order to state a claim under §
20(a)." *In Lihua Int'l, Inc. Sec. Litig.*, No-14-CV-5037 (RA), 2016 WL 1312104, at *18 (S.D.N.Y. March 31,
2016).

showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'") (quoting 17 C.F.R. § 240.12b–2).  Moreover, as detailed above, Plaintiffs have plausibly alleged that both of these individuals acted with scienter with respect to the false statements or omissions concerning FXCM's agency-trading model, the purported order flow arrangements with Effex, and GAAP. *See Lapin*, 506 F. Supp. 2d at 246 (Culpable participation under Section 20(a) "must be plead with the same particularity as scienter under section 10(b).").  Because Plaintiffs have not sufficiently attributed scienter to Defendant Lande with regard to these purportedly fraudulent or misleading statements or omissions, however, *see supra.* at 33-34, Plaintiffs have not sufficiently pleaded that this Defendant violated Section 20(a).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' second amended complaint is granted with respect to Defendant Robert Lande, and denied with respect to Defendants Global Brokerage, Inc., Dror Niv, and William Ahdout.  Specifically, the Court concludes that Plaintiffs have adequately alleged that Global Brokerage, Inc., Dror Nov, and William Ahdout committed securities fraud with regard to: (1) the agency-model statements identified by Plaintiffs from the beginning of the Class Period through the end of FXCM and Effex's order flow arrangement; (2) the order flow statements identified by Plaintiffs from the beginning of the Class Period through the Company's 2014 10-K; and (3) Plaintiffs' failure to disclose Effex as a VIE from the beginning of the Class Period through the end of FXCM and Effex's order flow arrangement.

In light of this Opinion and Order, Plaintiffs' July 2, 2018 letter motion for leave to file a

sur-reply in support of their second amended complaint is hereby denied as moot.

The Clerk of Court is respectfully directed to terminate items 117 and 126 on the docket and dismiss Defendant Lande from this action. Counsel for the remaining parties shall appear for a conference on May 9, 2019, at 3:30 p.m. No later than one week before this conference, the parties shall jointly submit a proposed case management plan and scheduling order. A template for the order is available at http://nysd.uscourts.gov/judge/Abrams.

SO ORDERED.

Dated:     March 28, 2019
           New York, New York

_____
Ronnie Abrams
United States District Judge

39